IN RE APPLICATION OF O. E. POULSON, INC.
O. E. POULSON, INC., APPELLANT, IMPLEADED WITH WYNNE TRANSPORT SERVICE, INC., ET AL., APPELLEES, V. HARGLEROAD VAN & STORAGE CO. ET AL., APPELLEES.
159 N. W. 2d 302
Filed June 7, 1968. No. 36707.

Nelson, Harding, Acklie, Leonard & Tate, for appellant.

Robert E. Powell, John E. Wenstrand, and James E. Ryan, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SPENCER, J.

This is an appeal by O. E. Poulson, Inc., from an order of the Nebraska State Railway Commission denying an application for an extended certificate of public convenience and necessity. On February 24, 1966, O. E. Poulson, Inc., filed its application requesting authority to transport acids and chemicals in bulk in tank or hopper-type vehicles between all points in Nebraska. On the same date, identical applications were filed by Wynne Transport Service, Inc., and Paul Abler, doing business as Central Transport Company, and on March 17, 1966, by D & R Bulk Carriers, Inc. Thereafter, on March 21, 1966, applications were filed by Ruan Transport Corporation, Peake, Inc., and Wheeler Transport Service, Inc., for authority to transport acids and chemicals (except those which are derived from petroleum or petroleum products) in bulk, in tank or hopper-type vehicles. Ward Transport, Inc., filed an identical application on April 4, 1966. On April 12, 1966, Bridge Brothers filed an application identical with that of the four companies first-above mentioned. All nine applications were combined for hearing purposes although separate orders were subsequently entered with reference to each application. Appearances were made by Hargleroad Van & Storage Co. and Herman Bros., Inc., protesting all applications. For convenience, the parties

interested will hereafter be referred to as Poulson, Wynne, Abler, D & R, Ruan, Peake, Wheeler, Ward, Bridge Brothers, Hargleroad, and Herman Bros. Ruan, Peake, Wheeler, and Ward also protested with reference to the applications of all the other parties interested.

During the course of the hearing, all applicants amended their applications to ask authority to transport "Fertilizers and fertilizer materials (with or without pesticides), feed ingredients, liquid feed supplements, anhydrous ammonia and urea, between points in Nebraska." Then the applications of Poulson, Wynne, Abler, and D & R were further amended by the insertion of the word "chemical" immediately ahead of the words "feed ingredients" so that the applications would read "chemical feed ingredients." A lengthy hearing was had on the nine applications and the protests in regard thereto. At the conclusion of the hearing, all applications were granted, excepting that of Poulson which was rejected. Poulson appeals and protestants appear as appellees herein.

The record discloses that Bridge Brothers, prior to this hearing, held authority to transport fertilizers and anhydrous ammonia between all points in Nebraska. The seven other successful applicants had authority to transport petroleum products, but such authority was limited as to the territories which could be so serviced in the cases of Wheeler, Abler, Wynne, D & R, and Ruan. Wheeler and Ruan also had authority to transport liquid fertilizers between all points in Nebraska. All of the carriers authorized to transport petroleum products, except those with liquid fertilizer authority, had made it a practice to transport anhydrous ammonia on the theory that it was a petroleum product, but there being considerable doubt on this point, it became apparent during the course of the hearing that there was a need of a determination by the commission of the authority to transport anhydrous ammonia as a petroleum product. The evidence in fact discloses that anhydrous ammonia is

generally derived as a product of natural gas but is: sometimes produced from coal and other sources and that it cannot correctly be considered a petroleum product. This was a matter that apparently had not been previously investigated by the commission and it had acquiesced in the transportation of anhydrous ammonia by those carriers holding authority to transport petroleum products. Poulson did not have authority to transport either petroleum products or fertilizers. It is apparent that, generally speaking, all applicants sought an extension of their respective authorities to permit the handling of the materials mentioned in the amended applications. Those applicants which held authority to transport petroleum products wanted that authority broadened and clarified so that they could transport anhydrous ammonia which would be included in the term fertilizer and fertilizer materials. All applicants except one with general fertilizer transporting authority, including two with authority to transport liquid fertilizers, desired their authorities expanded to include all fertilizers and fertilizer materials. Generally speaking, all applicants desired a further expansion of their respective authorities to include feed ingredients and liquid feed supplements. All requested authority to transport the products in question on a statewide basis between all Nebraska points. All nine of the applicants held interstate authority to transport the materials involved in this proceeding.

Hargleroad, one of the protestants, is in the process of selling its business to the other principal protestant, Herman Bros., and the evidence indicates that the tractors and trailers or motorized equipment held by Hargleroad are not being transferred to Herman Bros. It appears that Hargleroad is probably no longer a real party at interest in this action and that it is possible that the Hargleroad equipment may be removed from service in Nebraska.

There is some evidence in the record by protestants

that they are capable of handling all of the Nebraska intrastate business involving the products mentioned in the amended applications, but all parties conceded that there has been an extraordinary and phenomenal growth in the fertilizer business in Nebraska during recent years; that it increased about 25 percent in each of the past 2 or 3 years; and that it would continue such a rapid rate of development. Several new plants have been constructed in the area in the past 2 years and more are in the process of construction with old plants being rapidly enlarged. For example, a large storage facility is in the process of construction in Blair, Nebraska, on the Missouri River, with fertilizer products to be barged in on the river and thence to be distributed in Nebraska.

Representatives of shippers testified. These included Standard Chemical which handles feed products, Phillips Petroleum Company, Cominco American, Incorporated, Fel-Tex, Incorporated, Consumers Cooperative Association, and Gulf Oil Company which handle fertilizers and fertilizer materials. These witnesses testified in detail to the rapid expansion of the industry and contrary to the evidence given by the protestants, they stated that during busy seasons they were frequently unable to get their products moved by the existing carriers authorized to transport such products. They further indicated that they expected this difficulty to continue; that it was frequently detrimental to their business, as fertilizers constitute a product that is seasonal and must be made available promptly during the seasonal demand therefor; and that when unable to move their products, it resulted in a loss of business to their respective firms. Four of these shippers specifically supported the granting of all applications, including that of Poulson. The Phillips Petroleum Company representative recommended all except the Poulson application but refused to give any reason whatsoever for failing to endorse this application. The sixth, Gulf Oil Company, did not specifically endorse any particular application but stated

that it was primarily interested in seeing to it that sufficient transportation facilities were available for its use and that it certainly desired a continuance of the authority to handle its products insofar as the applicants were concerned with whom it had been doing business. It had not previously done business with Poulson, and possibly, inferentially, the testimony of this witness could be construed as not endorsing the application of Poulson, but on the other hand he was not objecting thereto.

It will be noted that in its original action, the commission granted authority to Poulson, Wynne, Abler, and D & R to transport anhydrous ammonia between all Nebraska points and withheld decision on the balance of the applications. This order was entered on March 14, 1967. On March 22, 1967, the commission countermanded the order of March 14, 1967, and authorized all nine applicants to transport: "Acids and chemicals used in the manufacture of fertilizers, feeds and feed supplements, insecticides, herbicides and the liquid finished products thereof, including anhydrous ammonia, in bulk in tank or hopper type vehicle" between all Nebraska points. The orders contained no reservation but a motion for rehearing was filed by protestants. Thereafter, on April 5, 1967, the March 22, 1967, orders were set aside and the orders of March 14, 1967, were reinstated with a similar reservation for further hearing regarding products other than anhydrous ammonia. On May 18, 1967, the orders of April 5, 1967, were set aside and the final orders heretofore referred to were entered granting all applications except that of Poulson. In each of its previous orders, the commission found that Poulson was: "* * * fit, willing and able properly to perform the service proposed, and to conform to the provisions of Sections 75-301 to 75-347, R. R. S., 1943, and the requirements, rules and regulations thereunder." It further found: "That the proposed service is or will be required by the present or future public convenience and

necessity * * *." In view of the previous findings of the commission, of the fact that eight of the nine applications were granted, and that no specific reason is given by the commission to justify its discrimination against Poulson, the question is posed as to what lies behind the broad finding that in the case of Poulson, public convenience and necessity do not require its services.

Appellees seek to justify the rejection of the Poulson application on three grounds: First, that it is a small concern; second, that it had not previously been transporting petroleum products and fertilizers; and third, a lack of shippers' support. To ascertain the validity of these objections, resort must be had to the record.

Ordinarily the only questions to be determined on appeal from the Nebraska State Railway Commission are whether the commission acted within the scope of its authority and whether the order complained of is reasonable and not arbitrarily made. Petroleum Transp. Co. v. All Class I Rail Carriers, 173 Neb. 564, 114 N. W. 2d 34. The only question to be determined here is whether the finding of the commission that the proposed service offered by Poulson is not required by the present and future public convenience and necessity is arbitrary and unreasonable under the evidence.

Regarding the first objection, it is true that it appears from the record that Poulson was a small operator; however, it may be pointed out that at one time probably all parties concerned were small operators and remained such until opportunities for growth were found in line with the increased demands of shippers and expanded certificates of public convenience and necessity were obtained from the commission. In the present instance, the evidence of the shippers completely refutes the statements of protestants to the effect that they can handle all business in the rapidly growing fertilizer and feed industry. Protestants have not been, and it is not anticipated that they will be, able to meet the

shippers' demands. It is, therefore, apparent that there is room for a newcomer on the scene. "In determining the issue of public convenience and necessity, in cases where new or extended operating rights are sought, controlling questions are whether the operation will serve a useful purpose responsive to a public demand or need; whether this purpose can or will be served as well by existing carriers; and whether it can be served by applicant in a specified operation without endangering or impairing the operations of existing carriers contrary to the public interest." Petroleum Transp. Co. v. All Class I Rail Carriers, *supra*. The only reasonable conclusion to be drawn from the evidence in this case is that the services offered by Poulson will serve a useful purpose responsive to a public demand or need, that this purpose cannot be served by existing carriers, and that the issuance of a certificate to Poulson will not endanger or impair existing carriers adversely to the public interest. In this respect, it may be pointed out that we have an unusual situation presented in this case. Ordinarily existing carriers will grow to meet the growing requirements of the companies or people they serve. Here we have an industry expanding so rapidly that existing carriers have not kept up with it and apparently they can not do so as they had not been able to satisfy anticipated demands of the shippers up until the time of hearing. The entry into the field of another carrier will not result in a loss of business to the existing carriers but will simply enable it to participate in the unprecedented growth of the business in respect to the transportation of the products in question here.

Regarding the second objection to the effect that Poulson had not been in this particular branch of the transportation business, it would seem that the statements made with reference to the first objection would be sufficient to show the invalidity of this argument. However, it may also be pointed out that each and every one of the successful applicants under the authority re-

ceived in the recent orders entered by the commission are authorized to enter into certain fields in which they had not been previously operating, and several of them have had their field of operations widened so that they are no longer restricted to certain specified territories, but may now do business between all Nebraska points. Those that had been previously transporting anhydrous ammonia under their petroleum product authority now appear to have been handling this commodity without authority, and the fact that they had previously so handled anhydrous ammonia does not appear to be pertinent to the present situation or to justify the exclusion of other applicants, particularly in view of the fact that Poulson had interstate authority to handle the same commodity and had been doing so for some time.

Regarding the third objection of lack of shippers' support, as previously pointed out, four out of the six shippers definitely supported the Poulson application. One objected thereto but refused to give any reason for such objection, and one adopted what might be considered a neutral attitude on the subject, but all shippers agreed that in the past and at the present time existing carriers had not been able to meet their demands and thereby inferentially supported the Poulson application.

"The purpose of the Nebraska Motor Carrier Act was regulation for the public interest. Its purpose was not to stifle legitimate competition but to foster it. Its purpose was not to create monopolies in the transportation industry, but to eliminate discrimination, undue preferences or advantages, and unfair or destructive competitive practices. Legitimate competition is a normal attribute of our free enterprise system. It must be permitted to exist and the law contemplates that it shall." Shanks v. Watson Bros. Van Lines, 173 Neb. 829, 115 N. W. 2d 441.

As observed in the foregoing quotation, it is not the purpose of the Nebraska Motor Carrier Act to promote unnecessary monopolies or to indiscriminately limit

competition. It would appear that the natural consequence of the commission's action in the present case would do just that and it must be concluded that the denial of the Poulson application was arbitrary and unreasonable.

REVERSED.

CARTER, J., dissenting.

The Nebraska State Railway Commission had before it nine applications for extended certificates of public convenience and necessity. The commission granted the application of eight of the applicants and denied the other made by the appellant in this appeal. It is conceded at the outset that all the applicants were equally qualified in all respects to enter into the common carrier field here involved. The real issue is whether or not, under these circumstances, this court has the power to direct or coerce the grant of a certificate of public convenience and necessity after the commission, after notices and hearings, has declined to do so.

The creation of the commission is by virtue of Article IV, section 20, Constitution of Nebraska, as implemented and limited by Chapter 75, R. R. S. 1943. By this constitutional amendment, the commission was given plenary and absolute power over common carriers except to the extent the Legislature has occupied the field or limited the powers of the commission by statute. While it is true that the commission has certain legislative and judicial powers, it is, in a broad sense, an administrative agency. Yellow Cab Co. v. Nebraska State Railway Commission, 175 Neb. 150, 120 N. W. 2d 922. The commission has the sole original jurisdiction to grant or deny a certificate of public convenience and necessity to a common carrier. In re Application of Effenberger, 150 Neb. 13, 33 N. W. 2d 296. See, also, Marconnit v. Effenberger, 135 Neb. 564, 283 N. W. 226. True, an objector may appeal from the grant of a certificate of public convenience and necessity on the basis that it is not supported by evidence and consequently arbitrary, and

will unjustly injure the reasonable financial return of those in the field which the commission is required to protect. True, also, the revocation of a certificate in whole or in part may be reviewed by this court to determine if such action is arbitrary as not being supported by evidence. But the denial of an application for a certificate of public convenience and necessity is something else and must be considered on a different basis.

As I have stated, the commission has absolute and plenary power over common carriers except where limited by statute. By section 75-311, R. R. S. 1943, a certificate is required to be issued by the commission, after notice and hearing, if the applicant is fit, willing, and able to properly perform the proposed service and conform to the provisions of sections 75-301 to 75-347, R. R. S. 1943, if it is consistent with the public interest. By section 75-301, R. R. S. 1943, the commission must regulate common carriers by motor vehicle in intrastate commerce to foster sound economic conditions in such transportation among such carriers in the public interest. It is required by the same statute to promote adequate economical and efficient service to the public at reasonable charges. These sections mean that adequate common carrier service must be furnished to the public at a reasonable charge and, on the other hand, the financial stability of common carriers already in the field must also be protected. Both are in the public interest. And in protecting the rights of each, a balance must be maintained between the volume of business and the number of common carriers required to perform the service at a reasonable charge. In making such a balance to protect the rights of users of the service and those performing the service, it is necessary that applicants for certificates be limited, however qualified they may be, to the number of carriers needed. This necessarily means that in the case of more applicants than needed, some must be denied certificates. The determination of the number of certificates to be granted rests exclusively

with the commission. This determination by the commission is an administrative or legislative function, and not a judicial one. The commission has the facilities, such as the requiring of reports and the making of investigations, to provide the expertise to make such administrative decisions. This court has neither the facilities to acquire such expertise, nor the expert knowledge to determine these questions which were granted solely and exclusively to the administrative agency.

This court has never had the precise point before it, although our cases point the way. The question has been raised in other jurisdictions. There are cases holding that the determination of the right to a certificate, is for the commission and the court is bound by the commission's findings on that question. Pirie v. Public Utilities Commission, 72 Colo. 65, 209 P. 640. A denial of a certificate in the public interest is a purely administrative question from which an unsuccessful applicant cannot appeal. Modeste v. Public Utilities Commission, 97 Conn. 453, 117 A. 494. The question of which petitioners could best serve the public is a matter left by the Legislature to the sound judgment and discretion of the Public Utilities Commission. It is not a judicial question subject to review by the courts. In re The Samoset Co., 125 Me. 141, 131 A. 692. Commission orders "purely negative— negative in form and substance—are, not subject to review by this court or any other." Sparta Foundry Co. v. Michigan Public Utilities Commission, 275 Mich. 562, 267 N. W. 736. Under the laws of Missouri, matters of public service are directly under the legislative agency and the, granting of certificates of public convenience and necessity do not come within the jurisdiction of any of the courts of that state. State ex rel. Ringo v. Public Service Commission, 234 Mo. App. 549, 132 S. W. 2d 1080. It was within the province of the commission to determine from the proof which of the, applicants was best equipped to render the service needed. There was ample evidence offered by each of the applicants to jus-

tify the commission in deciding that question either way, depending on where the public convenience and necessity would be best served. The courts would not be justified in such case to substitute their judgment for that of the commission. Tri-State Transit Co. v. Mobile & Ohio Transp. Co., 191 Miss. 364, 2 So. 2d 845. But the denial of an application as not being in the public interest is *not* a refusal to exercise the power granted to it, and is not reviewable.

The majority opinion cites no case from any court anywhere where the denial of a certificate by a railway or public utilities commission was reversed by the court. I have not found such a case and I am confident there is none. The appellant cites Northwestern Bell Tel. Co. v. Pleasant Valley Tel. Co., 181 Neb. 799, 150 N. W. 2d 922, in support of its position. In that case the area involved had no service at all and a qualified applicant was denied a certificate to serve the community. The underlying principle of that case is that the commission is required by law to furnish adequate service at a reasonable charge. It may not arbitrarily deny a qualified applicant to render service under such circumstances, although the remedy in some states is by quo warranto and not by appeal as here.

I submit that by the majority opinion, this court determines the public interest involved in the denial of the application for a certificate of public convenience and necessity, a matter placed by the Constitution solely and exclusively in an administrative agency. This is so even if it appears that the denial of the application is unreasonable, discriminatory, and arbitrary, for in no other way can the financial stability of certificate holders already in the field be protected from a saturation of the area by the issuance of new certificates to the damage or destruction of their investments in stations, offices, equipment, and other necessary facilities. The order made by this court is nothing less than an en-

croachment on the exclusive powers of the commission given it by constitutional provision.

The majority opinion appears to assume that discrimination and arbitrariness are always bad and that the courts have inherent power to correct all discriminatory or arbitrary orders. But this is not so. The Constitution, by Article IV, section 20, vested the commission with absolute power over common carriers, including the making of discriminatory and arbitrary orders, subject only to limitations provided by the Legislature. The Legislature has provided for the issuance of certificates to all qualified persons except where it would be contrary to the public interest to so do. The purposes of commission control of common carriers would be completely defeated if the commission lacked the power to limit the number of qualified applicants and to select the applicants from those qualified which, in its judgment, would best serve the public interest. Without the powers granted by the constitutional amendment, the issuance of arbitrary and discriminatory orders would violate the fundamental concepts of our free enterprise system and the right of every person to pursue the trade, business, or profession of his choice.

The Constitution grants to the commission the power to determine the public interest. The Legislature has not restricted this power in this area as is evidenced by section 75-301, R. R. S. 1943, when it refers to *"unjust* discriminations" and *"undue* preferences or advantages." (Emphasis supplied.) The majority opinion avoids the constitutional issues by the simple expedient of ignoring them and citing a rule of law, correct as a general statement of the law, but having no application whatever to the situation before us. By the majority opinion, this court undertakes to determine the public interest involved in the denial of a certificate of public convenience and necessity, and assumes this power unto itself when the Constitution places it exclusively in the hands of the commission. It is fundamental that it is one of the duties

of the courts to restrain the executive and legislative branches of government against the exercise of power that is constitutionally denied them. But it is just as important that the courts restrain themselves from the exercise of powers constitutionally denied them. It is hardly a justifiable reason to assume such an unjustified exercise of power by the simple expedient of ignoring the limitations imposed on the courts by the Constitution in placing the power elsewhere exclusively.

The law involved and the manner in which administrative orders are reviewed in the courts, is summarized in the following authorities: Jaffe, Judicial Control of Administrative Action, c. 14, p. 565; Gray v. Powell, 314 U. S. 402, 62 S. Ct. 326, 86 L. Ed. 301; National Labor Rel. Bd. v. Hearst Publications, 322 U. S. 111, 64 S. Ct. 851, 88 L. Ed. 1170; Universal Camera Corp. v. National Labor Rel. Bd., 340 U. S. 474, 71 S. Ct. 456, 95 L. Ed. 456. In this case the commission found in effect that the grant of eight certificates was all that was required and determined that the eight applications granted would best serve the public interest. This is the exclusive prerogative of the commission. In a similar case, in principle, the Supreme Court of the United States said: "In our view, the Court of Appeals in this case indulged in an unwarranted incursion into the administrative domain. The Commission's order had adequate support in the record and should have been affirmed." Securities & Exchange Commission v. New England Electric System, 390 U. S. 207, 88 S. Ct. 916, 19 L. Ed. 2d 1042.

The order appealed from in this case is an administrative order from an administrative agency. The power to deny an application for a certificate of public convenience and necessity is solely and exclusively that of the commission in determining the public interest. The courts are devoid of power under the constitutional provision to determine that the commission was in error in deciding that only eight certificates should be granted and the further determination that the eight granted

would best serve the public interest. The reversal of the order of the commission in this case is not only a direct violation of the constitutional power conferred on the commission, but it will have the effect of defeating one of the, fundamental purposes of commission control over common carriers. It purports to reverse or coerce the commission in an area over which the commission has the sole and exclusive constitutional power to act. The, majority opinion unlawfully encroaches on the exclusive power of the commission as an administrative agency. In my judgment, the applicant whose application was denied in the public interest has failed to present a justiciable issue, to this court and its appeal should be dismissed.

WHITE, C. J., concurs in this dissent.